UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

In the Matter of S.E.O. and
Y.O.[1]

NURETTIN OZALTIN,

          Petitioner,

   -v-

ZEYNEP TEKINER OZALTIN,

          Respondent.

-----------------------------------------------------------x

No.  12 Civ. 2390 (LTS)

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____           │
│ DATE FILED:  JUN 0 5 2012        │
└─────────────────────────────────┘
```

## MEMORANDUM OPINION AND ORDER

On March 30, 2012, Nurettin Ozaltin ("Petitioner") filed this Petition pursuant to
the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague
Convention") and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C.
§§ 11601 et seq.  Petitioner seeks the return of his two minor children, S.E.O. and Y.O., to
Turkey, and the enforcement of court-ordered visitation so long as the children remain in the
United States.  On April 2, 2012, the Court issued an order, directing Respondent Zeynep
Tekiner Ozaltin ("Respondent") to show cause as to why the Petition should not be granted.  On
April 30, 2012, and May 1, 2012, the parties appeared before the Court for an evidentiary
hearing.  The Court has also received extensive written submissions from the parties.  The Court
has reviewed carefully the parties' written submissions and the hearing testimony and, for the
following reasons, the Petition is granted.  The following Memorandum Opinion constitutes the

---

[1]      Consistent with Fed. R. Civ. P. 5.2(a), only the initials of the minor children involved
are used in the caption and in the body of this document.

Court's findings of fact and conclusions of law.

<u>BACKGROUND</u>

The following facts are found to be established, based on the parties' evidentiary proffers, except to the extent characterized below as allegations. Both Petitioner and Respondent are dual citizens of Turkey and the United States. (Petition ¶¶ 8-9.) They were married on March 24, 2001, and have two daughters, S.E.O. (aged 8) and Y.O. (aged 6) (collectively, the "Children"). (Id. ¶¶ 10-13.). Both children were born in New York and are also dual citizens of Turkey and the United States. (Affidavit of Zeynep Tekiner Ozaltin (hereinafter "Zeynep Aff.) ¶ 6.) Until December 22, 2010, the parties and the Children resided primarily in Turkey, first in Ankara and then in Istanbul. (Petition ¶ 16.) The Children regularly attended school in Turkey. (Id. ¶ 17.)

Respondent alleges that, on December 21, 2010, she and Petitioner had an argument about his drinking problem. (Zeynep Aff. ¶ 14.) During the argument, Petitioner told Respondent to take the Children and get out of the house. (Id.) He warned her that, if she did not do so, he would fire the staff, close the house and cut her off financially. (Id.) In her testimony at the hearing, Respondent further alleged that Petitioner shoved her and threatened to kill her. (Hearing Tr. 196-98.) The next day, December 22, 2010, Respondent decided to take the Children to New York for the holidays, and purchased roundtrip tickets for a flight out of Turkey. (Id. ¶¶ 15-16.) Respondent alleges that she called Petitioner from the Frankfurt airport during a layover to inform him that she was taking the Children to New York, and that Petitioner responded with words to the effect of "fine, stay there." (Id. ¶ 17.) Petitioner denies that the December 21, 2010, encounter and December 22, 2010, conversation ever took place. Since

December 22, 2010, Respondent and the Children have been living in New York City.

On January 7, 2011, Petitioner filed an application, pursuant to the Hague Convention, with the Turkish Ministry of Justice (the "Ministry"), seeking the return of the Children from the United States to Turkey. (Petition ¶ 31, Ex. B.)

On January 11, 2011, Respondent, acting through her Turkish attorney, Mr. Cetin Yildirimakin, applied for an order of protection against Petitioner. (Zeynep Aff. ¶ 21.) The 2d Uskudar Family Court issued an ex parte order of protection, directing Petitioner to refrain from using violence or threatening language against Respondent, from damaging the personal belongings of other family members, and from disturbing either Respondent or the Children by communication. (Declaration of Cetin Yildirimakin (hereinafter "Yildirimakin Decl."), Ex. B.)

On February 9, 2011, Respondent commenced a divorce action against Petitioner in the 3d Uskudar Family Court (the "Turkish Court"). (Yildirimakin Decl. ¶ 10.) Petitioner filed a cross-complaint for divorce. (Petition ¶ 34.) The divorce proceedings are currently pending.

On March 22, 2011, the Turkish Court ordered Petitioner to pay Respondent temporary alimony, of 4000 TL for the Respondent, and 3000 TL for each of the children. (Yildirimakin Decl., Ex. D.)

On May 13, 2011, Petitioner requested that the Turkish Court grant him provisional custody of the Children. The court rejected this request, but issued an order granting Petitioner overnight visitation with the Children, in the United States, on the first and third weekends of the month, from 10:00 a.m. on Saturday to 12:00 p.m. on Sunday. (Petition, Ex. C; Yildirimakin Decl., Ex. E.)

Petitioner exercised his visitation rights several times between May 13, 2011, and

August 2011, traveling to the United States to see the Children.  (Petition ¶ 36.)

On July 28, 2011, the Turkish Court issued an order granting Petitioner a two-week visitation period with the Children, from August 18, 2011, to September 1, 2011.  (Petition ¶ 37, Ex. D.)  On August 12, 2011, the Turkish Court issued an additional order, allowing Petitioner to take the Children outside the United States during the two weeks of visitation, and directing Respondent to give Petitioner the Children's passports.  (Petition ¶ 38, Ex. E.)

The Children visited with Petitioner in Turkey from August 18, 2011, until September 18, 2011, two weeks longer than the court-ordered visitation period.  On September 8, 2011, and September 14, 2011, the Turkish Court issued orders directing Petitioner to return the Children to their mother immediately.  (Yildirimakin Decl., Exs. G, H.)  In the September 14, 2011, order, the Turkish Court specifically found that Petitioner "behaved contrary to good will and intentions by not delivering the children [to Respondent] on the appointed date, and that the children needs [sic] the care and compassion of their mothers [sic]."  (Id., Ex. H.)  Petitioner ultimately turned the Children over to Respondent's representative on September 18, 2011, but the Children and Respondent remained in Turkey until November 4, 2011.  (Petition ¶¶ 41-42.)  The delay in returning to the United States was the result of Petitioner's failure to provide the Children's passports to Respondent.[2]  Respondent ultimately secured new passports for the Children's return travel.

After returning to the United States with the children in November 2011,

---

[2]     It is unclear whether the passports were lost or stolen, and Petitioner's account of events is inconsistent.  Compare Petition ¶ 42 n.4 (the passports were stolen) with Petitioner's Exhibit 21 (the passports were lost in a neighborhood in Istanbul on September 9, 2011)) with Petitioner's Exhibit 27 (the passports were lost on a flight to Istanbul on September 8, 2011) with Hearing Tr. 162 (the passports were lost on September 18, 2011).

Respondent denied Petitioner the weekend visitation rights granted by the Turkish family court, stating that she would permit Petitioner to see the Children only if he complied with conditions that the Turkish court had not imposed.  (Petition ¶¶ 54 -55.)  Respondent has permitted visitation since the instant Petition was filed.

On March 30, 2012, the Turkish Court again denied Petitioner's request for provisional custody of the Children, but reaffirmed the previously established visitation arrangements.  (Yildirimakin Decl., Ex. I.)

Throughout their lives, the Children have regularly traveled to and spent extended periods of time in New York.  (Zeynep Aff. ¶¶ 6, 32.)  The Children are currently enrolled in school in New York and are also involved in various extracurricular activities.  (Id. ¶¶ 33, 35.) They have a close network of friends and family in New York, including Respondent's mother and sisters.  (Id. ¶ 34.)

The parties first appeared before this Court on April 2, 2012, at which point the Court granted the following interim relief: 1) an order requiring Respondent to allow Petitioner the visitation rights granted him by the Turkish Court during the pendency of this action; 2) an order prohibiting the removal of the Children from New York State during the pendency of this action; and 3) an order requiring the surrender of the Children's United States passports to the Court for the pendency of this action.[3]

Petitioner presently seeks the following permanent relief: 1) An order, pursuant to Article 12 of the Convention, directing the return of the Children to Turkey; 2) an order, pursuant to Article 21 of the Convention, enforcing, so long as the Children remain in the United States, Petitioner's rights of access to the Children (as granted by the Turkish Court); and 3) an

---

[3]     The Children's U.S. passports, both expired, are currently filed under seal.

order, pursuant to Article 26 of the Convention, directing Respondent to pay the costs incurred by Petitioner in connection with this action.

## DISCUSSION

The goals of the Hague Convention are to secure the prompt return of children wrongfully removed to or retained in any contracting State, and to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.[4]  Hague Convention, art. 1.  Both the United States and Turkey are Contracting States within the meaning of the Convention.  This Court has jurisdiction of the petition pursuant to 42 U.S.C. §11603.

To establish that Respondent wrongfully removed the Children from Turkey and/or wrongfully retained them in the United States, Petitioner must show by a preponderance of the evidence that: "(1) the habitual residence of the child[ren] immediately before the date of the alleged wrongful retention was in [Turkey]; (2) the retention is in breach of custody rights under [Turkish] law; and (3) the petitioner was exercising custody rights at the time of the alleged wrongful retention." In re Lozano, 809 F. Supp. 2d 197, 218 (S.D.N.Y. 2011); see also 42 U.S.C. §11603(e).  If Petitioner satisfies this burden, the Court must return the Children to Turkey, unless Respondent can establish both that this proceeding was commenced more than one year after the Children's removal from Turkey and that the Children are now well settled in

---

[4]    See also Navani v. Shahani, 496 F.3d 1121, 1129 (10th Cir. 2007) ("The basic purpose and function of the Hague Convention and ICARA are to ensure the home country should make the custody determination").

their new environment.[5]  See Hague Convention, art. 12.

The Court finds that, until December 22, 2010, Turkey was the Children's habitual residence.  While the children traveled regularly to the United States, their primary residence was in Turkey, they attended school in Turkey, and their physicians, caretakers, and several extended family members were located in Turkey.  The Court further finds that, despite a heavy business travel schedule, Petitioner was exercising custody rights at the time of the alleged wrongful retention.

Wrongful Removal and Retention

The first issue at this juncture, therefore, is whether Respondent's removal of the children on December 22, 2010, and subsequent retention of them in the United States was wrongful.  Respondent first argues that her removal of the Children on December 22, 2010 was not wrongful because it was done with Petitioner's knowledge and consent.  To support this claim, Respondent relies on her account of her interaction with Petitioner on December 21, 2010, and her subsequent December 22, 2010 phone conversation with Petitioner from the Frankfurt airport.  Petitioner denies that the December 21, 2010 encounter and the December 22, 2010 conversation took place.  It is not necessary for the Court to determine the credibility of Respondent's allegations concerning Petitioner's conduct on the night of December 21, 2010, as Petitioner is not seeking an order from this Court that would require the Children to live with him, and Respondent does not allege that Petitioner consented to the removal of the Children

---

[5]     Regardless of how much time has elapsed, the Court need not order a child's return if Respondent can establish a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. Here, Respondent does not allege that the return of the Children to Turkey would expose them to such a grave risk.

from Turkey at that time.  Furthermore, even if this Court were to credit Respondent's account

of the alleged December 22, 2010, conversation, Petitioner's alleged statement to the effect of

"fine, stay there," cannot be interpreted as consent to change the children's habitual residence

from Turkey to the United States, in light of Respondent's own testimony that, at the time, she

intended to return the Children to Turkey.  Indeed, all of the proffered evidence indicates that

Petitioner at no time consented to relocation of the Children's residence to New York: since

January 2011, Petitioner has contacted the Turkish Ministry of Justice, sought custody of the

Children in Turkish courts, and pursued his petition in this Court.  Even if Petitioner approved

the continuation of the Children's travel to New York, which was already in progress at the time

Respondent allegedly placed the call from the Frankfurt airport, it is clear from the record that

Petitioner neither consented or acquiesced in Respondent's subsequent retention of the Children

in New York since that time.

Respondent's next argument is that her retention of the Children in New York is

not wrongful because she has provisional custody of the Children, and so her retention does not

violate Petitioner's custody rights.  Respondent bases this reasoning on two premises - first, that

Turkish law does not recognize the concept of joint custody and only awards one parent custody

of a child upon separation; and second, that the Turkish Court has entered several orders denying

Petitioner provisional custody.  Thus, Respondent argues, the court orders denying Petitioner's

requests for provisional custody effectively grant Respondent provisional custody.

Turkish Civil Code Article 336 provides that:

> As long as the mother and the father are married, the custody of children is shared
> equally between the mother and the father.  If they separate or divorce, the judge
> may decide to give the custody of the children to one of the spouses.  In the event
> of the death of one of the spouses, custody belongs to the surviving spouse.

(Petitioner's Ex. 3.)

At the April 30, 2012, and May 1, 2012, hearings, both Petitioner and Respondent proffered testimony by Turkish legal experts as to the parties' respective custody rights. Respondent's expert witness, Mr. Cetin Yildirimakin (who represents Respondent in the Turkish divorce proceedings), testified that, once parties separate, a Turkish court *must* grant provisional custody of the children to one parent or the other. (Hearing Tr. 179.) Mr. Yildirimakin testified in a conclusory fashion that the various orders issued by the Turkish Court award Respondent provisional custody of the Children and that, by granting Petitioner visitation rights in the United States, the Turkish Court implicitly acknowledged that the Children need not be returned to Turkey. (See, e.g., Yildirimakin Decl. ¶¶ 8 - 24.)

In contrast, Petitioner's expert, Professor Sebnem Akipek Ocal, testified that, during the pendency of divorce proceedings, Turkish courts will typically order children to live with one spouse, but that such an order is not tantamount to a grant of provisional custody, and does nothing to alter the custodial rights of the non-resident spouse. (Hearing Tr. 27-29, 37-41, 39, 52-55, 59-62; Akipek Report 7-15.) Professor Akipek testified that the orders issued by the Turkish Court to date provided only that the Children would live with Respondent during the divorce proceedings and should not be read to "constitute or 'imply' a termination or suspension of [Petitioner's] custodial rights." (Akipek Report 17-18.)

Professor Akipek further testified that the Turkish Court lacked the power to order Respondent to return to the United States with the Children, because of the pending Hague Convention petition. (Hearing Tr. 50-51.) Burcu Siratas, Petitioner's Turkish divorce lawyer, corroborated this point, testifying that, at the parties' first appearance in the divorce proceeding, she had advised the Turkish Court that Petitioner had filed a Hague Convention application with

the Turkish Ministry of Justice and that the Turkish Court had instructed her to continue with

that application process. (Hearing Tr. 175.) The Ministry, which is Turkey's designated Central

Authority for purposes of the Hague Convention, has indicated that Petitioner and Respondent

have joint custody of the Children: on April 5, 2012, Judge Seval Arslan of the Ministry wrote to

the Department of State, the United States' designated Central Authority, and stated that

"although there is a pending divorce case between the parents before the Family Court in

Uskudar, the parents still have joint-custody rights and at the time of the wrongful removal they

also use [sic] to exercise those rights. In this context under Articles 3 and 12 of the Hague

Convention, the [mother] is in breach of rights of the [sic] custody under the law of Turkey in

which the children were habitually resident before the removal." (Petitioner's Exhibit 40.)

Additionally, Petitioner has cited several cases where courts have rejected

assertions that temporary orders of custody, issued while a divorce proceeding is pending,

deprive one parent of custody rights under the meaning of the Convention.[6] For example, in

Tabacchi v. Harrison, No. 99 C 4130, 2000 WL 190576 (N.D. Ill. Feb. 10, 2000), the court

considered a husband's petition to have his minor daughter returned to Italy. An Italian court

had granted the wife temporary custody of the child, allowed the child to reside with the wife in

the United States pending the conclusion of proceedings, and ordered the husband to pay child

support. Id., at *4. Nonetheless, when considering the husband's Hague Convention petition,

the district court concluded that "the Italian court's decision did not involve a final resolution of

---

[6]    Furthermore, the Supreme Court has taken an expansive view of "rights of custody"
for purposes of a Hague Convention claim. See Abbot v. Abbott, 130 S. Ct. 1983,
1995 (2010) (finding that, "rather than defining custody in precise terms or referring
to the laws of different nations pertaining to parental rights, the Convention uses the
unadorned term 'rights of custody' to recognize all the ways in which custody of
children can be exercised through a flexible interpretation of the terms used, which
allows the greatest possible number of cases to be brought into consideration")
(internal quotations omitted).

custody but merely granted [the wife] temporary custody" and denied the wife's motion to dismiss her husband's petition on the grounds that the custody of the children had already been decided. Id., at *9 n.5.

In light of Professor Akipek's report and credible testimony, the April 5, 2012, letter from the Turkish Ministry, and the weight of relevant caselaw, the Court is unpersuaded by Mr. Yildirimakin's assertion that the Turkish Court's orders are determinative of custody rights pending the parties' divorce proceedings. At best, the conflicting testimony of Professor Akipek and Mr. Yildirimakin as to which party has legal custody of the Children raises questions as to Turkish custody law and the intent of the Turkish Court. Both these questions are more appropriately resolved by the Turkish Court, as it is not the province of this Court to determine the merits of custody issues. See Lozano, 809 F. Supp. 2d at 217 ("the merits of any underlying custody claim are of no concern in a Hague Convention case"). Based on the plain language of the Turkish Civil Code's joint custody provision and the evidence concerning the parties' relevant actions and interactions, the Court concludes that Petitioner has met his burden of showing that Respondent's retention of the Children in the United States is wrongful under the Convention. Returning the Children to Turkey would serve the purposes of the Convention by giving both parties the opportunity to litigate and clarify custody issues in the home forum.

Whether the Children are Well Settled in New York

As more than one year has elapsed since Respondent originally removed the children from Turkey in December 2010[7], the Court is not obliged to order the Children's return

---

[7] Petitioner argues that the wrongful removal that is relevant for this case is the removal of the Children from Turkey in November 2011, following the summer visitation. If this were the case, twelve months would not have elapsed between that time and the filing of the present petition, and so the question of whether the children

to Turkey if Respondent can show that the Children are so well settled in New York that, "at least inferentially, return would be disruptive with likely harmful effects." In re Koc, 181 F. Supp. 2d 136, 152 (E.D.N.Y. 2001). The affirmative defense that a child is well settled in its new environment is meant to be narrow. See Lozano, 809 F. Supp. 2d at 218. Furthermore, "even where the respondent meets his or her burden to show that [the] exception applies, the court may nevertheless exercise discretion to order repatriation." Id. (internal quotations omitted); see also Friedrich v. Friedrich, 78 F. 3d 1060, 1067 (6th Cir. 1996) ("[A] federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention").

Some of the factors courts consider in determining whether a child is well settled include: 1) the age of the child; 2) the stability of the child's residence in the new environment; 3) whether the child attends school or day care consistently; 4) whether the child attends church (or another religious institution) regularly; 5) the stability of the mother's employment; and 6) whether the child has friends and relatives in the new area. Lozano, 809 F. Supp. 2d at 230-31.

S.E.O. and Y.O. are ages eight and six, respectively, and have spent the majority of their lives in Turkey. While Respondent argues that the Children are familiar with New York, their residence in New York has not been continuous since the December 2010 removal from Turkey, as the Children spent approximately eight months in New York (December 22, 2010 to August 18, 2011), and then spent two and a half months in Turkey (August 18, 2011 to November 4, 2011), before returning to the United States for another five months (November 4, 2011 to March 30, 2010) before this action was commenced. See Castillo v. Castillo, 597 F. Supp. 2d 432, 438 (D. Del. 2009) (noting that courts consider "to what extent the child has

are well settled in New York would be irrelevant. The Court assumes, for purposes of this petition, that the relevant removal date is December 2010.

maintained ties to the country of habitual residence"). Additionally, the children have regularly traveled between Turkey and New York throughout their lives, and are accustomed to spending several months in both countries. (See Zeynep Aff. ¶¶ 6, 32.) The Children attend school consistently in New York, but they also attended school consistently in Turkey and, if returned to Turkey, would re-enroll in their former school. Similarly, while the Children have numerous friends and family in New York, the same is true of their relationships in Turkey. The parties have proffered no evidence as to whether the Children regularly attend a religious institution in either New York or Turkey. Finally, given the financial resources available to both parties, the stability of Respondent's employment in New York is irrelevant. Considering all these factors, the Court finds that Respondent has failed to demonstrate by a preponderance of the evidence that the children are so well-settled in New York that returning them to Turkey would be "disruptive with likely harmful effects." In re Koc, 181 F. Supp. 2d at 152.

The Court will, accordingly, grant the Petition insofar as it seeks the return of the Children to Turkey. Such return will enable the Turkish Court to consider and address directly the question of whether the Children should continue to reside in New York while the divorce proceedings are pending.


Petitioner's Rights of Access Under the Turkish Court Order

Respondent contends that this Court lacks jurisdiction to enforce Petitioner's rights of access, relying on Article 21 of the Convention, which states that "[a]n application to make arrangements for organising or securing the effective exercise of rights of access may be presented to the Central Authorities of the Contracting States in the same way as an application

for the return of a child."[8] In support of this contention, Respondent cites two cases - Wiezel v. Wiezel-Tyrnauer, 388 F. Supp. 2d 206 (S.D.N.Y. 2005) and Bromley v. Bromley, 30 F. Supp. 2d 857 (E.D. Pa. 1998). In Wiezel, the court considered whether it "had jurisdiction over an Article 12 claim by a petitioning parent who claims to have custody rights but is seeking as, a remedy, only visitation and other access rights." 388 F. Supp. 2d at 211. The court concluded that it lacked such jurisdiction, and that "the Convention sets forth separate procedures by which signatory nations may enforce access rights of petitioning parents, and those procedures do not involve the federal courts." Id. Similarly, in Bromley, the court concluded that "the plain language of [Article 21] of the Convention does not provide federal courts with jurisdiction over access rights." 30 F. Supp. 2d at 860. In neither case, however, was the petitioning parent alleging wrongful removal of a child under Article 12 and seeking, as ancillary relief, rights of access as ordered by a court in the country of habitual residence. Furthermore, ICARA specifically authorizes a parent to "initiate judicial proceedings under the Convention . . . for organizing or securing the effective exercise of rights of access to a child [by] commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action." 42 U.S.C.A. § 11603(b) (West 2005). Given the language of the statute, this Court finds that it has jurisdiction to enforce Petitioner's rights of access to the Children, and orders Respondent to comply with the visitation rights set forth by the Turkish Court's May 13, 2011, Order, so long as the Children remain in the United States.

Costs

Article 26 of the Convention provides that:

---

[8]     The Central Authority for the United States is the Department of State.

Upon ordering the return of a child or issuing an order concerning rights of access under this Convention, the judicial or administrative authorities may, where appropriate, direct the person who removed or retained the child, or who prevented the rights of access, to pay necessary expenses incurred by or on behalf of the applicant, including travel expenses, any costs incurred or payments made for locating the child, the costs of legal representation of the applicant, and those of returning the child.

See also 42 U.S.C.A §11607(b)(3) (West 2005) ("any court ordering the return of a child . . . shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs [and] legal fees"). As the Court is granting the Petition, Respondent will be required to pay any necessary costs Petitioner incurred in connection with this action.

## CONCLUSION

For the foregoing reasons, the Petition is granted. Respondent is ordered to return the Children to Turkey by July 15, 2012. This deadline provides sufficient time for the Children to complete the current school year in the United States. Until the Children return to Turkey, Respondent is directed to comply with the May 13, 2011, Turkish Court order granting Petitioner rights of access to the Children. The Court is currently in possession of two expired United States passports for the Children. These passports will be released to Respondent, solely to facilitate an application for new passports for the Children so that they can travel to Turkey. Pursuant to the Court's April 2, 2012 Order, the Children may not be removed from the State of New York prior to the their return to Turkey.

Petitioner must file any request for the payment of his necessary expenses incurred in connection with this proceeding, no later than June 15, 2012. Such a request must include contemporaneous billing statements insofar as it seeks legal fees, and a detailed

explanation of how each expense for which payment is sought was necessarily incurred on

behalf of this action.  Respondent must file any objections to Petitioner's request for costs by

June 22, 2012.  Courtesy copies of the submissions must be provided to Chambers at the time of

filing.


Dated: New York, New York
       June 5, 2012

                                        LAURA TAYLOR SWAIN
                                        United States District Judge